UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

LARRY G. HINES,                        )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        No. 1:11 CV 32 DDN
                                       )
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )


**MEMORANDUM**

      This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
applications of plaintiff Larry G. Hines for disability insurance
benefits under Title II of the Social Security Act, 42 U.S.C. § 401, <u>et
seq.</u>, and supplemental security income under Title XVI of that Act, 42
U.S.C. § 1381, <u>et seq.</u>  The parties have consented to the exercise of
plenary authority by the undersigned United States Magistrate Judge
pursuant to 28 U.S.C. § 636(c).  (Doc. 6.)  For the reasons set forth
below, the decision of the Administrative Law Judge (ALJ) is reversed and
remanded.


**I.  BACKGROUND**

      On June 4, 2007, plaintiff Larry G. Hines applied for disability
insurance benefits and supplemental security income.  (Tr. 70-82.)  In
his applications, he alleged an onset date of November 15, 2005, on
account of diabetes, back problems, hypertension, high cholesterol, and
pain in his hips, shoulders, neck, knees, feet, wrists, and fingers.
(Tr. 48, 97.)  His claims were denied initially on November 2, 2007, and
he requested a hearing before an ALJ.[1]  (Tr. 39-40, 48-54.)

————————————————————

      [1]Missouri is one of several test states participating in
modifications to the disability determination procedures which apply in
this case.  20 C.F.R. §§ 404.906, 404.966 (2007).  These modifications
                                                         (continued...)

On August 14, 2009, following a hearing, the ALJ found Hines was not disabled. (Tr. 7-17.) On January 28, 2011, after considering additional medical records submitted directly to it, the Appeals Council denied his request for review. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

In 1992, Hines complained of a headache, neck pain, and dizziness.[2] He was prescribed Hydrocodone.[3] (Tr. 238.)

On July 7, 1992, Timothy Oltersdorf, M.D., reported to Dennis Lehman, M.D., that an MRI revealed that Hines possibly had an acute sinusitis. Dr. Oltersdorf, however, ruled out subdural hemotoma (Tr. 239.)

On July 9, 1992, M. Wallid Asfour, M.D., wrote to Dr. Lehman that he saw Hines for complaints of a headache, weakness in his arms, memory difficulties, and balance problems. Dr. Asfour noted that Hines had been hit in the left occipital area by a baseball bat, and that Hines had right ankle surgery in 1983. Dr. Asfour opined that Hines suffered from post cerebral concussive syndrome with headache; being off balance; irritability; memory difficulty; and air fluid level in the right sphenoid sinus, of doubtful significance. Dr. Asfour prescribed Elavil and Hydrocodone.[4] (Tr. 240-41.)

On August 13, 1992, Dr. Asfour wrote to Dr. Lehman again after seeing Hines. Dr. Asfour offered the same assessment and discontinued

---

[1](...continued)
include, among other things, the elimination of the reconsideration step. See id.

[2]The source of these medical records is not apparent from the administrative record.

[3]Hydrocodone is to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[4]Elavil is used to treat certain mental/mood problems, including depression. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

Hines's Elavil and muscle relaxants in favor of Relafen, a pain reliever, and Pamelor, an antidepressant.[5]  (Tr. 242-43.)

Records from August and September, 1992, indicate that Hines was prescribed Vicodin for continued head pain.[6]  (Tr. 244.)

On September 17, 1992, Dr. Asfour wrote to Dr. Lehman after seeing Hines.  Dr. Asfour added to his previous assessments that Hines suffered from post traumatic neck pain radiating to the left upper extremity with intermittent numbness of the left hand.  He ruled out cervical radiculopathy.  Dr. Asfour discontinued Hines's Pamelor, added Parafon Forte DSC, and ordered x-rays.[7]  (Tr. 245-46.)

From September 24, 1992 to June 26, 1997, Hines complained of, at varying times and to varying degrees, pain in his left arm, ribs, neck, back, both legs, kidney, groin, and ankle.  He was prescribed various medications, including Vicodin.  (Tr. 247-54.)

On October 17, 1995, an MRI of Hines's lumbar spine revealed minimal osteophyte formations at L4 and L5 and slight scoliosis.  Miguel Alday, M.D., noted that this was normal.  (Tr. 270.)

On June 27, 1997, Gary Gottfried, M.D., wrote to Dr. Lehman after evaluating Hines's neck and right forearm pain.  Hines reported that the pain began a month prior, when he attempted to move a heavy stove.  Dr. Gottfried opined that Hines had median nerve conduction slowing across his right wrist, consistent with mild-to-moderate Carpal Tunnel Syndrome.  Dr. Gottfried noted that an electromyography examination of Hines's cervical and upper thoracic paraspinal muscles appeared normal.  (Tr. 255-56.)

_____

[5]Relafen is used to reduce pain, swelling, and joint stiffness from arthritis.  Pamelor is used to treat certain mental/mood problems, including depression.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[6]Vicodin is used to relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[7]Parafon Forte DSC is used to treat pain and discomfort from muscle injuries.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

From June 30, 1997 to October 9, 1998, Hines was prescribed Vicodin and Hydrocodone for pain in his back, neck, shoulder, feet, leg, and ankle. (Tr. 258-59.)

On May 29, 1998, Gregory Jaryga, D.P.M., P.C., wrote to Dr. Lehman after examining Hines for foot pain. Dr. Jaryga recommended that Hines buy a new pair of work boots and prescribed Lodine.[8] (Tr. 260-61.)

From October 10, 1998 to December 12, 2002, Hines continued to complain of pain in his head, neck, and shoulders. His Vicodin, Hydrocodone, and Oxycontin prescriptions were refilled.[9] (Tr. 262-69.)

On March 7, 2000, a CT scan of Hines's face and jaw ordered by Dr. Lehman was approved by Sunbelt Medical Management. On March 16, 2000, Sunbelt approved three specialist visits. (Tr. 275-76.)

On March 9, 2000, Gary Waddell, M.D., evaluated images of Hines's sinus and opined that Hines had complete opacification of the sphenoid sinuses, mucosal thickening, and a deviated nasal septum. (Tr. 278.)

On March 15, 2000, John Shea, M.D., examined Hines upon complaints of headaches, a deviated septum, sinus infections, and post nasal drainage. Dr. Shea opined that Hines suffered from chronic sinusitis with associated headaches, dietary sensitivities, and possible inhalant rhinitis. Dr. Shea prescribed Dynabac, Nasarel, and Aquatab, and advised Hines to stay hydrated and return in one month.[10] (Tr. 277.)

On September 7, 2000, Sunbelt approved a contrast x-ray of Hines's urinary tract. (Tr. 279.)

From 2003 to 2005, Hines was seen at Shaw Medical Center in Burleson, Texas. During this time, his diabetes was evaluated and blood

---

[8]Lodine is used to relieve pain, swelling, and joint stiffness from arthritis. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[9]Oxycontin is used to relieve moderate to severe ongoing pain. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[10]Dynabac is used to treat bacterial infections in the throat. Nasaral is used to prevent and treat seasonal and year-round allergy symptoms. Aquatab is used to temporarily treat cough, chest congestion, and stuffy nose symptoms. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

work was regularly taken.  As of October, 2004, his diabetes was under control.  He was prescribed and refilled his Vicodin, Valium and Diazepam, Hydrocodone, and Actos prescriptions.[11]  (Tr. 206-13.)

On June 29, 2005, Stephen A. Segall, M.D., noted that Hines was a new patient with a history of diabetes, hypercholesterolemia, and hypertension.  Hines had been taking Crestor[12] and had been treated in Texas for years for chronic low back pain, although there was no radiology in his old chart supporting this.  Hines also suffered from muscle spasms in his neck, which he treated with Diazepam.  (Tr. 147.)

On August 10, 2005, Mark D. Zobres, D.O., opined that Hines's vertebra and interspaces were well maintained in their axial height and demonstrated normal signal.  Dr. Zobres found no disc bulging, protrusion, spinal stenosis, or foraminal encroachment.  An MRI of Hines's lumbar spine was negative.  (Tr. 152.)

From August 19, 2005 to June 22, 2009, Hines followed-up with Dr. Segall.  Hines reported pain in his back, knees, and hips.  Dr. Segall noted Hines's diabetes, hypertension, and gastroesophageal reflux disease (GERD).  (Tr. 139-46, 195-96, 202-05, 230-34, 280-84.)

On June 18, 2007, Hines completed a work history report in which he listed his prior work as an assistant construction supervisor and as a maintenance man.  As an assistant supervisor, he spent two hours daily walking, standing, and sitting, and one hour climbing, but did no lifting or carrying.  As a maintenance man, he spent two hours daily walking, standing, and sitting; one hour climbing; fifteen minutes stooping; forty-five minutes kneeling; fifteen minutes writing and handling small objects; and sometimes lifted twenty pounds.  (Tr. 104-110.)

That same day, Hines also completed a Function Report - Adult form.  He listed his daily activities as waking up, taking his medicine, making

---

[11]Valium and Diazepam are used to treat anxiety, acute alcohol withdrawal, and seizures.  Actos is an anti-diabetic drug used to control high blood sugar in patients with type 2 diabetes.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[12]Crestor is used to help lower bad cholesterol and fats and raise good cholesterol in the blood.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

breakfast, sitting down, watching television, and sitting on the porch. He reported living alone in a trailer and not taking care of other people or pets. He stated that illnesses and injuries reduced his ability to sit, stand, and sleep. He reported having pain dressing, bathing, and caring for his hair. He also reported that he prepares his own meals and goes shopping once a week, but that his sister does his laundry and his landlord cares for his yard. He also reported having pain lifting, walking, climbing stairs, squatting, sitting, bending, kneeling, using his hands, standing, and reaching. (Tr. 111-18.)

On August 3, 2007, Hines was transferred to St. Francis Medical Center for treatment of a grade one open right ankle (tibia-fibula) fracture. X-rays revealed extensive soft tissue swelling. Patrick R. Knight, M.D., performed corrective surgery that day, to which Hines responded well. On August 6, 2007, Hines had repeat washout surgery, and was discharged on August 10, 2007. Dr. Knight noted that Hines had social issues, which they discussed. Dr Knight advised Hines that failure to follow his instructions would jeopardize his outcome. (Tr. 156, 158, 160-62, 167.)

On August 20, 2007, Hines followed-up with Dr. Knight. His wound looked good; there was no evidence of infection. His ankle was put in a split and told to follow-up in a week. (Tr. 170.)

On August 23, 2007, Hines was seen by Patrick J. LeCorps, M.D., at the request of the Missouri Department of Family Services, upon a complaint of chronic lower back pain for the past thirty years. Dr. LeCorps noted that Hines was morbidly obese, diabetic, and hypertensive with hypercholesterolemia. Hines reported having pain irradiating to both legs with the left side worse than the right. He also reported that he stopped working because of the severity of the pain. Upon examination, Hines was unable to stand because of his right ankle injury. He had no leg length discrepancy, no pelvic tilt, and no surgical scars. Straight leg raising testing was sixty degrees on both sides. A FABER test, foraminal compression test, and Naffziger sign were all negative.[13]

_____

[13]A FABER test is used to determine the presence of sacroiliac disease, which is a disease caused by high-impact trauma to the
(continued...)

Deep tendon reflexes of the knees and ankles were normal, and his extensor hallucis longus was strong on the left side.[14] A spinal x-ray revealed no spondylolysis, spondylolisthesis, or disc space narrowing,[15] although there was some evidence of anterior traction spurs due to arthritis. There was no evidence of facet joint arthropathy, but there was sclerosis of the pedicle of L5 on the left. Beyond a slight curvature at L1-T12, x-rays were normal. Dr. LeCorps opined that a spinal MRI was needed for a definitive diagnosis. (Tr. 194.)

On August 27, 2007, Hines followed-up with Dr. Knight regarding his ankle injury. He had a little drainage, but no pus. Dr. Knight removed the lateral staples, prescribed Keflex and told Hines to follow-up in ten days.[16] (Tr. 171.)

On August 28, 2007, Hines met with Chul Kim, M.D., upon referral from the Missouri Department of Elementary and Secondary Education section of Disability Determinations, for examination of his lower back. Hines reported constant aching pain in his lower back through his hips. Hines stated that prior to his ankle injury, he was able to stand for ten or fifteen minutes; walk fifty yards; lift twenty pounds; sit for fifteen or twenty minutes; and drive a vehicle for fifteen or twenty minutes.

---

[13](...continued)
sacroiliac joint, located at the bottom of the back. http://physicaltherapy.about.com/od/orthopedicsandpt/ss/LEspecialtests_2.html (last visited November 9, 2011). A Naffziger sign is used to diagnose sciatica or a herniated intervertebral disc. http://www.medical-dictionary.thefreedictionary.com (last visited November 9, 2011).

[14]The extensor hallucis longus is the muscle responsible for extending (pulling back) the big toe. http://www.sportsinjuryclinic.net/cybertherapist/muscles/extensor_hallucis_longus.php (last visited November 9, 2011).

[15]Although often used interchangeable, spondylolysis refers to the separation of the pars interarticularis, a small arch in the back of the spine, while spondylolisthesis refers to slippage of one vertebra over another. Spondylolysis & Spondylolisthesis, http://www.spine-health.com (last visited November 9, 2011).

[16]Keflex is used to treat a wide variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

His ankle injury required him to use crutches to walk and caused him pain, although not as much as his back. (Tr. 178.)

An examination revealed that Hines's back was tender and that his lumbar spine had limited flexion. Straight leg raising was up to sixty degrees on the right side and fifty degrees on the left side with hip and lower back pain. His right hip and right knee had limited flexion and pain. His right lower leg was covered with a splint and bandages, tender at the ankle, and immobile. He was not able to put any weight on his right leg, and had difficulty getting off the examination table. X-rays of the lumbar spine revealed a ten-degree scoliosis with convexity to the right at L3-4 and degenerative joint disease with a mild degree of bone spur formation at multiple vertebrae. Dr. Kim's impressions were chronic lower back pain radiating to bilateral lower extremities with lumbar strain; probable degenerative joint disease; and recent right ankle fracture. (Tr. 179-80.)

That day, Dr. LeCorps examined Hines and completed a Medical Report for the Missouri Department of Social Services. Dr. LeCorps opined that Hines would be incapacitated for three to five months. (Tr. 192-93.)

On September 4, 2007, Hines followed-up with Dr. Knight. The drainage issue from his ankle injury was resolved and his wound looked good. Dr. Knight removed all but the medial staples and told Hines to return in two weeks. (Tr. 172.)

On September 17, 2007, Hines followed-up with Dr. Knight. His wound looked good and there was no evidence of infection. Dr. Knight removed the final staples and told Hines to return in two weeks. (Id.)

On October 1, 2007, Hines followed-up with Dr. Knight. Dr. Knight debrided a small area that did not appear infected. Radiographs showed adequate alignment, although fracture lines were still present. Dr. Knight prescribed Keflex as a prophylactic and told Hines to return in three weeks. (Tr. 185, 188.)

On October 22, 2007, Hines followed-up with Dr. Knight. He still had one small area that was continuing to heal but it did not appear infected. Dr. Knight changed his dressing, advised him to start testing his range of motion but not to bear weight, and told him to return in two weeks. (Tr. 186.)

On November 2, 2007, Melissa Guilliams, a medical consultant, opined that Hines could lift ten pounds occasionally and less than ten pounds frequently; stand and/or walk for at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push and/or pull without limitation. Guilliams found Hines's allegations of limitations credible and opined that Hines could frequently climb ramps/stairs and stoop, but only occasionally balance, kneel, crouch, and crawl. Guilliams further opined that Hines had no manipulative, visual, or communicative limitations and had no environmental limitations beyond avoiding concentrated exposure to vibration. (Tr. 42-45.)

On November 5, 2007, Hines followed-up with Dr. Knight. Dr. Knight noted that the wound continued to heal nicely. Dr. Knight debrided the wound a little, noted no evidence of infection, and told Hines to follow-up in three weeks. (Tr. 187.)

On November 26, 2007, Hines followed-up with Dr. Knight. Dr. Knight noted that the wound had finally healed and looked great. He ordered x-rays be taken in a few weeks and noted that if the x-rays looked good then he might increase Hines's weight bearing. (Tr. 224.)

On December 17, 2007, Hines followed-up with Dr. Knight. Dr. Knight noted that Hines's wound had healed and that Hines had a significant callus formation that looked good. Dr. Knight told Hines to begin bearing weight in his boot, showed him range of motion and strengthening exercises, and directed him to follow-up in six weeks. (Tr. 225.)

On January 7, 2008, Hines followed-up with Dr. Knight. He had a very limited range of motion and ankylosis of his ankle but was walking in his boot. X-rays showed no changes. Hines was to continue bearing weight and to follow-up in three months for another x-ray. Dr. Knight noted that Hines was applying for disability benefits, and opined that Hines was totally disabled from his ankle injury. (Id.)

On January 29, 2008, Dr. Segall completed a Medical Source Statement form. Dr. Segall stated that Hines was receiving treatment for lower back pain, diabetes, high blood pressure, an ankle fracture, chronic sinusitis with headaches, neck spasms, and arthritis of the hips, knees, and shoulders. Dr. Segall opined that Hines could lift and/or carry five pounds frequently; stand and/or walk for less than fifteen minutes

continuously; sit continuously or throughout an eight-hour work day for less than fifteen minutes; and could not push or pull. Dr. Segall also opined that Hines could never climb, balance, kneel, or crouch; occasionally stoop, crawl, reach, handle, finger, and feel; and frequently see, hear, and speak. Dr. Segall noted that Hines was to avoid any exposure to vibration, hazards, and heights, and to avoid even moderate exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, and fumes. (Tr. 198-200.)

On February 5, 2008, Dr. Knight wrote an open letter stating that Hines has suffered a severe distal tibial intra-articular fracture prior to August 6, 2007, and had surgery in August, 2007. Dr. Knight wrote that although Hines had healed, his ankle injury remained a significant disability because of pain and his inability to walk. Dr. Knight opined that because of the ankle injury, Hines was disabled and unable to work. (Tr. 220.)

On April 7, 2008, Hines followed-up with Dr. Knight. Dr. Knight noted that his wound looked good, although he still had considerable swelling. Hines was able to wear a normal boot and ambulate with minimal difficulty. X-rays showed a well-healed fracture. Dr. Knight released Hines to perform activities as-tolerated, and opined that Hines was going to be disabled from his ankle injury. (Tr. 237.)

On April 21, 2008, Dr. Knight completed a Medical Source Statement form based on Hines's right ankle injury. Dr. Knight opined that Hines could lift twenty-five pounds frequently and fifty pounds occasionally; stand and/or walk less than fifteen minutes continuously and less than one hour in an eight-hour workday; sit for three hours continuously and eight hours in an eight-hour workday; and not push or pull. Dr. Knight also opined that Hines could never climb or balance; occasionally stoop, kneel, crouch, or crawl; and frequently reach, handle, finger, feel, see, hear, and speak. Dr. Knight listed no environmental factors, and opined that Hines did not need to lie down to alleviate symptoms during an eight-hour workday. (Tr. 227-29.)

On April 25, 2009, Hines completed a Daily Activities form. He reported that he was not working and that his health precluded him from working regularly. He stated that each day was a "bad day" in which he

functioned very poorly; he had difficulty getting up and had pain when he moved.  He reported difficulty sleeping, climbing stairs, helping others, and shopping, although he was able to make some meals and do his own laundry.  He also indicated having difficulty with all work-related activities, including sitting, standing, walking, lifting, crouching, bending, understanding, and concentrating.  (Tr. 134-38.)

On June 12, 2009, Hines was seen at St. Francis Medical Center for shortness of breath and anxiety.  He was treated by Donna Carney, M.D., and advised to return to the emergency room if his symptoms persisted. (Tr. 285-88.)

On August 18, 2009, Dr. Zubres reported imaging results to Abdul Naushad, M.D.  Imaging of Hines's lumbar spine showed no vertebral compression, normal bone density, intact interspaces, and small-to-moderate marginal osteophytes.  Dr. Zubres opined that Hines suffered from mild-to-moderate lumbar spondylosis.  Imaging of Hines's knees revealed mild-to-moderate narrowing, lateral meniscal compartment, normal bone density, and no joint effusions or loose bodies.  Dr. Zubres opined that as to his right knee, Hines suffered from degenerative narrowing and lateral meniscal compartment, and as to his left knee, Hines suffered from lateral degenerative joint disease, symmetric with the right side. (Tr. 289-90.)

Imaging of Hines's left ankle revealed no fracture or dislocations; intact ankle mortise; normal bone density; no soft tissue abnormalities; and a large plantar calcaneal spur.  Dr. Zubres opined that Hines had a heel spur.  Imaging of Hines's right ankle showed old healed fracture deformities of the distal tibial and fibular shafts; internal fixation by metallic plates; narrowing of the lateral ankle mortise; degenerative spurring of the medial dome of the talus; and a prominent heel spur.  Dr. Zubres opined that Hines had internal fixation of the distal tibia and fibula, degenerative changes at the ankle mortise, and a heel spur. (Tr. 291-93.)

Imaging of Hines's cervical spine revealed mild osteopenia, mild narrowing, C6 and C7 disc spaces with small marginal osteophytes, and

intact posterior elements and dens.[17]  Dr. Zubres opined that Hines had
mild osteopenia and mild degenerative joint disease.  Imaging of Hines's
cervical spine revealed straightening of the cervical lordosis;[18] no
vertebral compression or disc space narrowing; dehydration in all
cervical discs; a minor concentric C4 and C5 disc bulge; no disc
protrusions, spinal stenosis, or foraminal encroachment; and a normal
cord signal.  Dr. Zubres opined that Hines had minor degenerative joint
disease and a disc bulge at C4-5.  Imaging of Hines's lumbar spine
revealed no vertebral compression or disc space narrowing; mild
desiccation of the L4 disc; minor marginal osteophytes; small-to-moderate
sized left foraminal and lateral protrusion of the L3 disc; a minor L4
disc bulge; no spinal stenosis; and a conus medullaris at L1.  Dr. Zubres
opined that Hines had mild desiccation of the L4 disc, left foraminal and
lateral protrusion of the L3 disc, and a minor disc bulge at L4.  (Tr.
294, 302-03.)

On September 25, 2009, Hines saw Dr. Naushad for a routine visit.
Hines reported his pain as a level ten on a ten-point scale; that his
medicine was working but could be stronger; that he had no side effects
from his medication; and that the humidity and weather were making him
hurt worse.  He complained of pain in his back, shoulders, forearms,
wrists, hips, and ankles.  Dr. Naushad prescribed Kadian, Naproxen, and
Oxycodone, and advised Hines to lose weight and follow-up in one month.[19]
(Tr. 297-301.)

In an undated Disability Report - Adult form, Hines listed his
height as five feet, eight inches and his weight as 250 pounds.  He
stated that his diabetes, back, hips, shoulders, neck, knees, feet,

---

[17]The dens, or odontoid process, is a toothlike process that projects
from the superior surface of the body at C2.  http://www.medical-
dictionary.threefreedictionary.com/den (last visited November 9, 2011).

[18]Lordosis is an increased curving of the spine.  Medline Plus,
http://www.nlm.nih.gov (last visited November 9, 2011).

[19]Kadian and Oxycodone are used to help relieve moderate to severe
ongoing pain.  Naproxen is used to relieve pain from various conditions,
including headaches, muscle aches, tendonitis, and dental pain.  WebMD,
http://www.webmd.com/drugs (last visited November 9, 2011).

wrist, fingers, hypertension, high blood pressure, and high cholesterol prohibited him from working because they made his fingers and feet numb and his back, hips, and knees hurt. He stopped working on November 15, 2005, because he was laid off. His previous job as an assistant supervisor required him to spend ten hours daily walking, standing, climbing, writing, and handling small objects; three hours stooping; one hour climbing; sometimes carrying materials weighing fifty pounds six or eight feet; and frequently lifting less than ten pounds. He finished the twelfth grade and has special training in heating and air conditioning. He cannot read, write, or spell well. (Tr. 96-102.)

In an undated Disability Report - Appeal form, Hines reported an increase in his back and leg pain since 2007 from his broken ankle. He also stated that his illnesses and injuries made caring for his personal needs difficult. (Tr. 125, 128.)

In an undated Recent Medical Treatment form, Hines reported visiting Dr. Segall monthly for three and one-half years. Hines stated that Dr. Segall told him that his condition had not improved, that he did not expect any improvement, and that he expected his condition to worsen. (Tr. 131.)

**Testimony at the Hearing**

On July 15, 2009, a hearing was held before an ALJ. (Tr. 20-38.) Hines testified to the following. He was born on March 22, 1952, and was fifty-seven years old at the time of the hearing. He completed the twelfth grade and can read fairly well. He is unmarried and has no children under the age of eighteen. He is five feet, eight inches tall and weighs 302 pounds. He has no source of income, although he does have a Medicaid card. He has a driver's license but his vehicle is not licensed and he does not have insurance; other people drive him around. (Tr. 22-24.)

Hines last worked in 2005 doing maintenance work at the Southeast Community Treatment Center. Presently, he would not be able to do the lifting and other strenuous work of that job. Although he did not miss work because of his health problems, his employer allowed him to take frequent breaks. Before working there, he did construction work for

Thomas S. Burns, where he only lifted ten or twelve pounds at a time. He could not do this work presently because has too much pain in his back, legs, hips, and knees. (Tr. 25-27.)

His doctors in Texas told him that his pain was caused by scoliosis. He sees a pain doctor, Dr. Segall, who gives him medication and checks his blood sugar and pressure. He has pain in his shoulders, lower back, hips, knees, and ankles. Dr. Knight told him that he would probably not be able to work because of damage done to his leg. He has been hurting for more than twenty years, during which time he worked off and on because of his pain. His pain got so bad that he would go home and cry at night and wake up the next morning dreading to try going to work. The pain is a constant ache, although it is also sharp and causes numbness. (Tr. 27-28.)

In 2006, he broke his ankle in an accident. He is in constant pain, the severity of which is between eight and ten on a scale of one to ten. He had to go to the emergency room in June because he felt like he could not breathe. Dr. Segall gives him pain medication, although it never takes the pain away or makes it tolerable. His pain worsens when he does almost anything. When he first hurt his back, he used a TENS unit and had therapy, but they did not help. (Tr. 29-31.)

His pain precludes him from working. He cannot walk far without a problem and can sit for only about twenty minutes at a time. He can stand in one place for only between five and ten minutes. He rarely goes grocery shopping; his sister-in-law often gets his groceries. It is painful for him to bend over and touch his knees. He is able to stoop down and get back up slowly. He could not lift a gallon of milk throughout the day because his back, hips, and shoulders would hurt. His lower back hurts when he has to push or pull things. He gets significant numbness in his hands and burning and aching in his feet from his diabetes. (Tr. 32-34.)

He usually wakes up early because he does not sleep well and goes to bed at night at 10:30 p.m, although he only sleeps a few hours. He tries to go back to bed, but has to take his pain medicine to sleep. He does not do much when he is awake during the day. He cleans his house, but it takes a long time. He only leaves to go to the doctor and

occasionally to get groceries.  He does not go to church and rarely visits friends or relatives.  He cannot hunt anymore because of his pain.  He uses paper plates so that he does not have to do the dishes because it bothers him to stand and try to do dishes.  He has high blood pressure, but it is controlled by medication.  The pain is what keeps him from working.  (Tr. 34-37.)

### III.  DECISION OF THE ALJ

On August 14, 2009, the ALJ issued a decision denying Hines's claims.  (Tr. 10-17.)  At Step One, the ALJ found that Hines met the special earnings requirements of the Act and had not engaged in substantial gainful activity since his alleged onset date, November 15, 2005.  (Tr. 16.)

At Step Two, the ALJ found that Hines has severe impairments of obesity, status-post right ankle fracture, mild degenerative disc disease of the lumbosacral spine, and Type II diabetes mellitus, hypertension, hyperlipidemia, and GERD controlled by medication.  At Step Three, the ALJ found that none of Hines's severe impairments met or equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

The ALJ then determined that Hines retained the residual functional capacity (RFC) to perform the physical exertional and nonexertional requirements of light work except for lifting or carrying more than ten pounds frequently or twenty pounds occasionally.  Based on this RFC, at Step Four the ALJ found that Hines could perform his past relevant work as a construction industry assistant supervisor.  Thus, the ALJ found that Hines was not disabled within the meaning of the Act.  (Tr. 16-17.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is

substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. <u>Id.</u> As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his impairment meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. <u>Id.</u> Step Four requires the Commissioner to consider whether the claimant has the RFC to perform his past relevant work. <u>Id.</u> The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. <u>Id.</u> If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. <u>Id.</u>

In this case, the ALJ determined that although Hines suffers from severe impairments, he retains the RFC to perform his past relevant work as a construction industry assistant supervisor.

## V. DISCUSSION

Hines argues that the ALJ erred by not giving more weight to the opinions of his treating physicians, Dr. Knight and Dr. Segall. He also

argues that the ALJ erred in discounting his credibility. He further argues that the ALJ's determination that he could perform his past relevant work as a construction industry assistant supervisor is not supported by substantial evidence because it is conclusory and disputed by the record.

## A. Opinions of Dr. Knight and Dr. Segall

Hines argues that the ALJ erred by not giving more weight to the opinions of his two treating physicians, Dr. Knight and Dr. Segall.

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is generally given controlling weight, but it is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). For example, a treating physician's opinion does not control when it is undermined by other credible evidence in the record, including the treating physician's own inconsistencies. Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009); Hacker, 459 F.3d at 937.

### 1. Dr. Knight

Dr. Knight was Hines's orthopedic surgeon who treated his right ankle and continued treating him for his ankle after surgery. On January 7, 2008, Dr. Knight opined that Hines was totally disabled from his ankle injury. (Tr. 225.) On February 5, 2008, Dr. Knight opined that although Hines had healed, his ankle injury remained a significant disability because of pain and his inability to walk, and that because of his ankle injury, Hines was disabled and unable to work. (Tr. 220.) On April 7, 2008, Dr. Knight opined that Hines was going to be disabled from his ankle injury. (Tr. 237.) On April 21, 2008, Dr. Knight opined that Hines could lift twenty-five pounds frequently and fifty pounds occasionally; stand and/or walk less than fifteen minutes continuously and less than one hour in an eight-hour workday; sit for three hours continuously and eight hours total in an eight-hour workday; not push or pull; never climb or balance; occasionally stoop, kneel, crouch, or

crawl; and frequently reach, handle, finger, feel, see, hear, and speak. (Tr. 227-29.)

In affording Dr. Knight's opinions little weight, the ALJ noted that Dr. Knight's opinions were contradicted by his treatment notes. For example, on April 7, 2008, in addition to opining that Hines would be disabled from his ankle injury, Dr. Knight opined that Hines's wound looked good, although he still had considerable swelling; that he was able to wear a normal boot and ambulate with minimal difficulty; and that x-rays showed a well-healed fracture. (Tr. 237.) Dr. Knight also released Hines to perform activities as-tolerated. (Id.) The ALJ was permitted to discount Dr. Knight's opinion regarding disability on the basis that it was contradicted by his own treatment notes. Hacker, 459 F.3d at 937. Moreover, the ALJ reasoned that the entire documented course of treatment for Hines's ankle covered less than the necessary twelve month period for a finding of disability. See 20 C.F.R. § 404.1509 (stating that a claimant's impairment must have lasted or be expected to last for a continuous period of at least twelve months for it to be disabling).

The ALJ could not have adopted Dr. Knight's opinion that Hines is "disabled," because this is an issue reserved exclusively for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); Brown v. Astrue, 611 F.3d 941, 952 (8th Cir. 2010); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]." (citation omitted)).

Therefore, substantial evidence supports the ALJ's decision to afford little weight to Dr. Knight's opinion.

### 2. Dr. Segall

Dr. Segall was Hines's primary care physician dating back to June, 2005. On January 29, 2008, Dr. Segall opined that Hines could lift and/or carry five pounds frequently; stand and/or walk for less than fifteen minutes continuously and less than ten minutes in an eight-hour

workday; sit continuously or throughout an eight-hour work day for less than fifteen minutes; not push or pull; never climb, balance, kneel, or crouch; occasionally stoop, crawl, reach, handle, finger, and feel; and frequently see, hear, and speak. (Tr. 198-200.)

The ALJ listed several reasons for affording Dr. Segall's opinion little weight. The ALJ reasoned that Dr. Segall's notes showed that Hines's diabetes, hypertension, hyperlipidemia, and GERD were well controlled by prescribed oral medication. Haught v. Astrue, 293 F. App'x 428, 429 (8th Cir. 2008) (per curiam) (holding that the ALJ's reasons for affording the treating physician's opinion little weight, including because the claimant's symptoms were controlled by medication when she took it, were proper). The ALJ also noted that there was no documented evidence of secondary damage to Hines's eyes, heart, brain, or kidneys, or of any severe neuropathy from either diabetes or hypertension, and that Dr. Segall's assessment was based partly on Hines's allegations that had no objective support. See Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[A] statement not supported by medical diagnoses based on objective evidence[]will not support a finding of disability.") Hines's x-rays and an MRI of his lumbrosacral spine showed only minimal degenerative disc disease. Moreover, these allegations were not mentioned in the majority of Dr. Segall's medical records. The remaining impairments, illnesses, and injuries were acute and caused no long-term limitations or complications. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." (citations omitted)).

Therefore, substantial evidence also supports the ALJ's decision to afford Dr. Segall's opinion little weight.

**B. Credibility**

Hines next argues that the ALJ erred in discounting his credibility. He argues that the ALJ's credibility analysis was deficient and that the objective evidence, namely the opinions of Dr. Knight and Dr. Segall and the disability finding by Dr. LeCorps of the Missouri Department of Social Services, support his allegations of pain and limitations.

The ALJ found Hines's allegations concerning the severity of his symptoms and limitations not credible. To the extent Hines contests the sufficiency and content of the ALJ's credibility analysis, this court disagrees. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). However, the ALJ need not discuss each factor; the ALJ need only "acknowledge[] and consider[]" the Polaski factors before discounting a claimant's subjective complaints. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).

After summarizing Hines's testimony, the ALJ identified the Polaski factors. The ALJ then evaluated Hines's work record, which he found neither supported nor detracted from Hines's credibility, and considered Hines's treatment record, including the opinions of Dr. Knight, Dr. Segall, and Dr. LeCorps. The ALJ noted that the objective medical evidence, such as x-rays and an MRI of the lumbosacral spine, was not consistent with Hines's complaints, and that Hines did not have most of the signs typically associated with chronic, severe musculoskeletal pain. The ALJ also noted that there was no evidence supporting an inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment. Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider.").

The ALJ also noted that although Hines had alleged low back pain for many years, it had not stopped him from working before he was laid off. Schach v. Apfel, 210 F.3d 379, 2000 WL 311036, at *1 (8th Cir. 2000)

(unpublished table decision) (per curiam) (holding that the ALJ properly discredited the claimant's subjective complaints where the claimant worked for more than twenty years as an airline pilot prior to the alleged disability onset date despite having back pain and double vision); Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009) (holding that the ALJ correctly discounted the claimant's credibility where "[the claimant] was laid off from [his] position due to a decline in work, and [the claimant] claimed the date he was laid off was the same date of the alleged onset of disability").  The ALJ also noted that Hines did not require a cane, crutches, or other assistive device to stand or walk. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005) (holding that the claimant did not require a cane was inconsistent with subjective allegations of functional limitations).

Therefore, the ALJ's credibility analysis was not deficient and is supported by substantial evidence.


## C.  Step Four

Hines also argues that the ALJ erred in finding that he has the RFC to perform his past relevant work as a construction industry assistant supervisor.  Hines asserts that the ALJ's determination is not supported by substantial evidence because it is conclusory and disputed by the record.

At Step Four, the ALJ must consider whether the claimant retains the RFC to perform his past relevant work, either as the claimant actually performed the work or as the work is performed generally throughout the national economy.  Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007). If the claimant is able to perform either the specific work previously done or the same type of work as generally performed, the claimant is not disabled.  Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000).  In determining whether the claimant can perform his past relevant work as he actually performed it, "[t]he ALJ must . . . make explicit findings regarding the actual physical and mental demands of the claimant's past work."  Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999); accord Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991) ("[A]n ALJ has an obligation to fully investigate and make explicit findings as to the

physical and mental demands of a claimant's past relevant work and to
compare that with what the claimant [himself] is capable of doing before
he determines that [he] is able to perform [his] past relevant work."
(citation omitted) (emphasis in original)).

The ALJ found Hines not disabled because he retained the RFC to
perform his past relevant work as a construction industry assistant
supervisor as he actually performed it. (Tr. 13, 16.) In so holding,
the ALJ made no express findings regarding the physical demands of the
job, either as Hines performed it or as generally performed. Rather,
citing Hines's June 18, 2007 Work History Report, the ALJ stated only
that Hines's "past relevant job as a construction assistant supervisor,
as he described and performed it, did not require the performance of work
activities precluded by these limitations." (Tr. 13, 104-10.)

The ALJ did not expressly resolve the inconsistencies in the record
regarding the demands of Hines's work as a construction industry
assistant supervisor. In an undated Disability Report - Adult form,
Hines stated that his previous job as an assistant supervisor required
him to spend ten hours daily walking, standing, climbing, writing, and
handling small objects; three hours stooping; one hour climbing; to
sometimes carry materials weighing fifty pounds six or eight feet; and
to frequently lifting less than ten pounds. (Tr. 98-99.) In his June
18, 2007 Work History Report, Hines stated that his construction industry
assistant supervisor job required him to spend two hours daily walking,
standing, and sitting, and one hour climbing, but no lifting or carrying.
(Tr. 104-07.) At the hearing, Hines testified that his construction
industry assistant supervisor position required him to lift ten or twelve
pounds at a time. (Tr. 26.) The ALJ did make express findings resolving
these differing job descriptions.

The Commissioner concedes the ALJ did not make explicit findings
regarding the physical and mental demands of Hines's past work as a
construction superintendent, but contends that remand is not necessary
because the ALJ was permitted "to implicitly resolve the inconsistencies
in these reports against [Hines]." (Doc. 13 at 14.) However, the Eighth
Circuit has made clear that an ALJ's "failure to fulfill this obligation
[to make explicit findings as to the demands of a claimant's past work]

requires reversal." <u>Groeper</u>, 932 F.2d at 1238; <u>see</u> <u>Pfitzner</u>, 169 F.3d at 569 (reversing because the ALJ's implicit reference to the Dictionary of Occupational Titles "le[ft] to speculation which of the[] job descriptions reflect[ed] [the claimant's] past relevant work").

Therefore, remand is necessary for the ALJ to resolve the inconsistencies and make express findings regarding the physical and mental demands of Hines's past relevant work as a construction industry assistant supervisor. In addition, given the discrepancies regarding the demands of Hines's past work, the ALJ should obtain additional information from either a vocational expert (VE) or the Dictionary of Occupational Titles to determine the demands of Hines's past work as he actually performed it. 20 C.F.R. § 404.1560(b) (noting that "[s]uch evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work." (emphasis omitted)); 20 C.F.R. § 416.960(b)(2) (noting that "[s]uch evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work"); <u>see also</u> <u>Duncan v. Astrue</u>, No. 4:09CV00458 JTR, 2010 WL 3523064, at *4 (E.D. Ark. Sept. 3, 2010) (holding the ALJ properly relied on VE testimony in finding that the claimant could return to his past relevant work as he actually performed it where the claimant's characterization of his work was inconsistent and not credible). After making express findings regarding the demands of Hines's past work, the ALJ should then determine whether Hines can perform this work in light of his RFC.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded. An appropriate Judgment Order is issued herewith.

_____/S/___David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 21, 2011.